# SUPREME COURT.

THE TOWN OF GRAVESED, plaintiffs agt. CYRUS CURTISS, WIL-
LIAM C. ANDERSON and JAMES R. ALLABEN, Commission-
ers of Quarantine.

The *commissioners of quarantine* will be restrained by injunction from taking, carry-
ing on or continuing any proceedings, to acquire title to a tract of land selected by
them as a site for a landing and boarding station, and from taking possession
thereof, where the facts in the case are such as to justify and sustain the inference
that the large tract of land was not *bona fide* selected only as a site for a landing
and boarding station, but with a view to other purposes.

*Second District General Term, September,* 1867.
*Before* LOTT, BARNARD *and* GILBERT, *Justices.*

APPEAL from an order dissolving an injunction. An injunc-
tion order was granted in this action, *at special term,* on the
29th July last, upon the complaint and affidavits, with
liberty to the defendants to move at the August special term,
on two days' notice to the plaintiffs, to dissolve the injunction.
At the August special term, upon the complaint and affida-
vits, and the answer and affidavits, after full argument,
the injunction was dissolved, on the ground that the proper
parties defendants were not included in the action; that the
metropolitan board of health, and the mayors of New York and
Brooklyn, who, with the defendants commissioners of quaran-
tine, or a majority of them, constituted the board who were
authorized to select the location for quarantine site for land-
ing and boarding station, on the west end of Coney Island.
From this order dissolving the injunction the plaintiffs
appealed to the general term. The complaint and answer,
each supported by affidavits, will sufficiently show the
grounds upon which the injunction is sought.

COMPLAINT—*County of Kings,* ss:
The town of Gravesend, plaintiffs, by way of complaint

against Cyrus Curtiss, William C. Anderson and James R. Allaben, the commissioners of quarantine, show:

That the plaintiffs are the owners in fee simple of Coney Island, which is situated in the county of Kings, and within the town of Gravesend.

That the legislature of the state of New York, by an act passed on the 22d day of April, 1867, did enact, that the commissioners of quarantine, the metropolitan board of health, and the mayors of the cities of New York and Brooklyn, were thereby authorized and directed as soon as practicable after the passage of said act, to select a suitable site on Barren Island to erect a temporary structure, if it should become necessary, until a suitable permanent structure shall be erected on West Bank (which the said board were there-directed to construct as soon as practicable), with all the necessary appurtenances for the reception and temporary detention of passengers under quarantine who have been exposed to contagious or infectious diseases, but who are not actually sick, and who may be sent there by the health officer pursuant to law; and it was thereby further enacted as follows:

"They shall also select a suitable site for a landing and boarding station on the west end of Coney Island, to be used in place of the one specified in the twelfth section of chapter 751 of the laws of 1866. Said sites shall be selected as near to each other as the safety of the public health and the convenient discharge of the duties of the health officer will permit. As soon as said sites, or either of them, shall be determined upon by said commissioners, the metropolitan board of health and the mayors of said cities, or a majority of them, they shall certify that fact in writing to the governor, lieutenant-governor and comptroller; and if the site or sites so selected shall be approved by them, or a majority of them, they or such majority shall make and sign a certificate of the fact, specifying particularly therein the site or sites so selected, and file the same in the office of the secretary of

state; and thereupon the said commissioners shall become and be deemed to be empowered to acquire title to the lands specified in said certificate, and fit up the same for quarantine purposes, as thereinafter specified."

And it was also thereby provided, that as soon as a site or sites shall have been selected and determined upon in the manner thereinbefore provided, if they shall be unable to acquire title thereto in behalf of the people of the state by purchase, at a price which shall be approved by the governor, they may acquire title thereto in behalf of the said people, in the same manner and by the same proceedings as as are prescribed for acquiring title to lands by railroad corporations, in and by the provisions of chapter 140 of the laws of 1850, and the acts amendatory thereof.

And the plaintiffs further show, that, in pursuance of said act, the commissioners of quarantine, the metropolitan board of health, and the mayors of the cities of New York and Brooklyn, duly selected, as the defendants claim, as the site for a landing and boarding station on Coney Island, a tract of land upon said Coney Island by the following description: All that part of Coney Island, in the county of Kings, which lies westerly of a line drawn from the southwest corner of the house erected at Bath, on the shore of Long Island, owned or occupied by C. Godfrey Gunther, across Gravesend bay and said island, in a due southerly course, until it reaches the Atlantic ocean.

And that the defendants are proceeding to acquire title thereto by legal proceedings, and have given notice of the presentation of a petition before the supreme court, at the city of New York, for the appointment of commissioners to appraise the compensation for the same.

And plaintiffs further show, that the land so designated 'and sought to be taken as a site for a landing and boarding station is a very large tract of land, containing about 300 acres above high water mark, with a water front of nearly

three miles, and including the land between high and low water mark, probably 600 acres.

That it grossly exceeds in quantity what is necessary for the legitimate purposes of a landing and boarding station.

That a landing and boarding station, within the intent and meaning of the law, is only a place for the location of the health officer and his subordinates from which to go to board vessels arriving at the port of New York, and that five acres square of upland, with the water front adjacent to it, would be amply sufficient for the purpose, and afford every convenience.

That the whole quarantine ground on Staten Island consists of about twenty-five acres, and that the ground reserved from that tract for the purposes of a landing and boarding station, by section 12 of chapter 751 of the laws of 1866, contains, by estimate from the commissioners' map, less than five acres of upland, and a pier and dock adjacent.

That instead of selecting a site for a landing and boarding station upon the westernmost end of Coney Island, as authorized by the act, the commissioners have, in substance, appropriated the whole westernmost end of the island, and have, in fact, selected, and are proceeding to acquire title to, more than sixty times as much land as is necessary for the purposes authorized by law, and more than ten times as much as would be necessary for the whole quarantine establishment, including hospitals and a place for persons not sick, who have been exposed to contagious or infectious diseases.

And the plaintiffs aver that the proceedings of the defendants are wrongful and fraudulent as against the plaintiffs. That they are grossly and wrongfully exceeding the powers given them by law to acquire title to a site for a landing and a boarding station, and are proceeding under cover and pretence of said law, but in contravention thereof, and in violation of law and of right, and for ulterior objects and purposes not sanctioned by law, to acquire title to, and get pos-

session of, a large tract of land, with an extensive water front, not necessary for the purposes for which alone the legislature has allowed any land upon Coney Island to be taken for quarantine purposes.

And plaintiffs show that such proceedings, if not stayed by the interposition of this court, will produce great and irreparable injury to them, and for which they have no adequate remedy by the rules of common law.

Plaintiffs therefore pray that the selection of the tract of land above described upon Coney Island, as a site for a landing and boarding station, may be set aside, and that the defendants, their attorneys and agents, and all other persons acting for, under or with them, may be enjoined by the order of this court from taking, carrying on or continuing any proceedings to acquire title to said tract of land, or for the appraisement of the compensation to be paid therefor, and from taking possession of or in any manner interfering with the said land or any part thereof, and that said injunction may be made perpetual, with costs of this action; or for such further and other relief as to the court may seem just and proper in the premises.

BENJ. G. HITCHINGS, *Attorney.*

*County of Kings,* ss:

Jacques J. Stilwell, being duly sworn, says, that he is supervisor of the town of Gravesend, the plaintiffs in this action; that the foregoing complaint is true of his own knowledge, except as to the matters therein stated on information and belief, and as to those matters he believes it to be true.

JACQUES J. STILWELL.

Sworn to before me, this 29th } day of July, 1867.

E. WILSON BLOOM,
*Notary Public for Kings Co.*

ANSWER.—The defendants above named, appearing in this

action by H. W. Johnson, as their attorney, make the following answer to the complaint:

I. Upon information and belief, they deny that the plaintiffs are the owners in fee simple or otherwise of Coney Island, situate within the town of Gravesend, in the county of Kings; and on the contrary thereof, they allege that said plaintiffs have no interest whatever in said island, or any part thereof, but that the same is owned by Martin Schoonmaker, Nicholas Stilwell, and a large number of other persons residing mostly in said town.

II. They allege that, pursuant to the act of the legislature mentioned in the complaint, all that part of said island which is described in said complaint has been duly designated and selected as a site for a landing and boarding station, for the purposes in said act specified, and a certificate of such selection has been duly filed, as required by said act; that they have been unable to acquire title thereto at a price approved by the governor; and they admit that, in consequence thereof, they design to acquire title thereto by the legal proceedings authorized by said act, and that they have given notice that a petition for that purpose will be presented by them to this court, at a special term thereof to be held in the city of New York, on the first Monday of August, 1867.

III. These defendants are ignorant of the precise quantity of land embraced within that portion of said island which has been so selected and designated as aforesaid, but upon information and belief they deny that it embraces the quantity or has the water front stated in said complaint, and they deny that it grossly exceeds, or in any manner or respect exceeds in quantity what is necessary for the legitimate purposes of a landing and boarding station; and they deny that a landing and boarding station, within the intent and meaning of the law, is only a place for the location of the health officer and his subordinates, from which to go to board vessels arriving at the port of New York, or that five acres square of upland, with the water front adjacent to it, would

be amply sufficient for the purpose and afford every con-
venience. And said defendants further deny, that they, or
the officers and boards mentioned in the acts aforesaid, have,
in fact or in substance, selected, or that they are proceeding
to acquire title to more than sixty times, or any other number
of times, as much land as is necessary for the purposes
authorized by law or by the act aforesaid, or that they have
selected or are proceeding to acquire title to more than ten
times or any number of times as much as would be necessary
for the whole quarantine establishment, including hospitals
and a place for persons not sick, who have been exposed to
contagious or infectious diseases; but, on the contrary thereof,
these defendants aver that the quantity of land selected and
designated as aforesaid, considered with reference to its pecu-
liar character and location and surroundings, in no respect
exceeds, but in fact falls short of, what is really required for
the purposes specified in the act aforesaid.

IV. These defendants further deny that their proceedings
have been in any respect wrongful or fraudulent as against
the plaintiffs or any other parties or persons, or that these
defendants are in any respect grossly or wrongfully exceeding
the power given them by law to acquire title to a landing
and boarding station, or that under cover or pretence of said
law, but in contravention thereof, and in violation of law
or of right, and for ulterior objects and purposes not sanc-
tioned by law, they are proceeding to acquire title to and get
possession of a large tract of land, with an extensive water
front, not necessary for the purposes for which alone the
legislature allowed any land on Coney Island to be taken for
quarantine purposes; but on the contrary thereof, these
defendants allege that, in all their proceedings under the act
aforesaid, they have been actuated solely by the intent to
carry out what they conceived to be the real object and pur-
poses of said act, and with a view to secure to the state what
they believed to be absolutely essential to the due adminis-
tration and observance of the quarantine rules and regulations

of the port of New York. And these defendants deny that their proceedings, if not stayed by the interposition of this court, will produce great and irreparable injury, or any injury whatever, to said plaintiffs, for which they have not an adequate remedy at common law.

Wherefore, these defendants pray that said complaint may be dismissed, with costs.

H. W. JOHNSON,
*Attorney for defendants.*

*City and County of New York,* ss:

Cyrus Curtiss, being duly sworn, says, that he is the president of the board of commissioners of quarantine, and one of the defendants in the above entitled action, and that the foregoing answer is true to his own knowledge, except as to those matters that are therein stated on information and belief, and as to those matters he believes it to be true.

CYRUS CURTISS.

Sworn to before me, this 1st
day of August, 1867.

W. H. MORGAN, *notary public.*

BENJAMIN G. HITCHINGS *and*
HENRY C. MURPHY, *counsel for plaintiffs.*

I. Upon the facts stated in the complaint, a case is made out of the strongest possible character for judicial relief.

The case, upon plaintiffs' allegations, is not only one of flagrant wrong on the part of the defendants, but the injury to ensue to the plaintiffs' from their proceedings, if they are permitted to consummate them, will be of the gravest character, involving their not only being deprived of a large amount of property, but also great and irreparable injury to other property not taken, aside from other consequences.

The right of taking private property for public use rests entirely upon *necessity*, and courts have been and should be vigilant in protecting the citizens from its abuse.

Even an act of the legislature which provides for the taking of more land than *is* necessary for the public use is void. (*Matter of Albany street*, 11 *Wend.* 143; *Embury* agt *Conner*, 3 *Comst.* 511.)

We complain that the defendants, acting under power conferred upon them by the legislature to select and acquire title to property for a specified purpose, instead of selecting a suitable plot of not more than five acres, with a water front of a few hundred feet, which would have been amply sufficient for the purpose, have selected, and are proceeding to acquire title to several hundred acres of land, with a

water front of three miles, , ostensibly for the purpose authorized by the act, but in reality for other purposes-

If this allegation is maintained, the right to relief from such proceedings is beyond question.

II. The jurisdiction of courts of equity to interpose, by injunction, in a case such as made by the complaint, is entirely settled by numerous authorities, and in fact has never been disputed. (*Mohawk R. R.* agt. *Artcher,* 6 *Paige,* 87, 89; *Gardner* agt. *Newburgh,* 2 *Johns. Ch.* 162; *Belknap* agt. *Belknap,* 2 *Johns. Ch.* 463: *Albany R. R.* agt. *Brownell,* 24 *N. Y.* 345; *Oakley* agt. *The Trustees, of Williamsburgh,* 6 *Paige,* 262; *Wetmore* agt. *Story,* 22 *Barb.* 415; *Williams* agt. *The N. Y. Central R. R.* 16 *N. Y.* 97, 111; *Corning* agt. *The Troy Iron Factory,* 39 *Barb.* 325; 2 *Kent's Comm.* 339, note c.; *Redfield on Railways,* § 205; *Webb* agt. *The Manchester Railway,* 1 *Railway Cas.* 576; *Webb* agt, *The Manchester Railway,* 4 *Mylne & Cr.* 116; *Bird* agt- *The W. & M. Railway,* 8 *Richardson Eq. R.* 46; *Agar* agt. *Regents Canal Co. Cooper's Cas. in Ch.* 77; *Bonaparte* agt. *The Camden R. R.* 1 *Baldw. C. C.* 226.)

It is no objection to the equitable jurisdiction that there may be other remedies. (*Cases above cited.*)

The case of liens upon land for illegal taxes and assessments, stands upon different ground, and has in some degree been made an exception from the current of decisions.

In *Meserole* agt. *The Mayor* (26 *Wend.* 132), the court of errors decided that the assessment being illegal and void, it could not be enforced, and was therefore no cloud upon the title; but in *Scott* agt. *Onderdonk,* (14 *N. Y.* 9), it was decided, that, inasmuch as the deed to be given by the sheriff on a sale for assessment was *prima facie* evidence of the regularity and validity of the proceedings that chancery had jurisdiction to stay such proceedings by injunction.

But these are cases of *mere liens* upon land, and no case can be found where equity has refused to interfere to prevent illegal proceedings which aimed at depriving a man of his land, or doing a permanent injury to it.

" Courts of chancery have jurisdiction to proceed by injunction, where public officers, under a claim of right, are proceeding illegally and improperly to injure or destroy the real property of an individual or corporation, although the defendant may may be sued at law." (*Redfield on Railways,* § 205; 6 *Paige,* 88.)

" Courts of equity will enjoin a railway from taking land *ostensibly under their powers for one purpose, when in fact they desire it for another* not within their powers. And in all cases of doubt with respect to their power, the conclusion should be against its exercise." (*Redfield on Railways,* § 205; *Webb* agt. *The Manchester Railway,* 1 *Railw. Cas.* 576; 4 *Mylne & Cr.* 116.)

In that case, the lord chancellor ordered a commission to ascertain whether the land which the railroad was seeking to acquire was actually necessary for purposes within their powers, and, upon coming in of the report, ordered a perpetual injunction.

So in *Agar* agt. *The Regent's Canal Co.* (*Cooper' Cas. in Ch.* 77), the chancellor ordered an issue to ascertain whether the land sought to be acquired was within the limits of the canal fixed by the act

It is important to observe that the railroad act, made applicable to this case, provides that, upon the completion of the proceedings to ascertain the compensation and payment thereof, or deposit of it in court, the commissioners are authorized to take possession and use the land, " *and all persons made parties to the proceedings are forever barred and divested of all right, estate or interest in the land.*" (*Laws of* 1850, *p.* 29, § 18.)

It is much more than doubtful whether, if the proceedings to acquire title were

completed, ejectment or trespass would lie, and the points upon which we rely could not be raised and tried in the proceedings to fix the compensation, nor upon *certiorari*·

So that the remedy by injunction is not only the proper one, but probably the only one.

III. The board of health and the mayors of the two cities are not necessary or proper parties.

They have no interest whatever in the matter, and nothing further to do in regard to it. They were mere agents in selecting the site, and having done that, are *functus officio*.

By the act, if they had not concured in selecting a site within thirty days from the passage of the act, their power would have been gone ,and others were to act in their stead.

If we should make them parties, it is plain that they would have a clear right to have the complaint dismissed, with costs, as to them, on the ground that they have no interest in the matter. Of course we could have no injunction against them, for they have nothing to do and are doing nothing.

By the law, the quarantine commissioners alone, after the selection of the site, are to proceed to acquire the titile, and alone are so proceeding.

Besides, no such point is made by demurrer or answer, and a defect of parties must be raised by one or the other. (*Code*, §§ 148, 144.)

IV. The case made by the complaint and affidavits on the part of the plaintiffs, is not changed or impaired by the answer and affidavits on the part of the defendants.

1st. The legislature intended to provide, and did provide, that no part of the quarantine establishment, but merely the landing and boarding station, should be located upon Coney Island. They specially provided for the location of every part of the establishment which might be dangerous or infectious elsewhere. A landing and boarding station was evidently considered, and, if used for its legitimate purposes only, no doubt is perfectly inoxious.'

2d. The allegation of the complaint and affidavits, that five acres of land, with the water front adjacent, is all that is necessary for the actual uses and purposes of a landing and boarding station, is in no way contradicted or denied.

It was all that they had for that purpose on Staten Island, and all that they reserved for that purpose out of the sale of their lands there, and the station on Coney Island, was, by the act, to be instead of that on Staten Island.

No uses of such a station are set out requiring more than five acres.

*Swinburne* enumerates the uses and makes the most of them, but he does not say that those uses require more ground than we alleged was sufficient.

3d. It is undisputed that the site they claim to have selected embraces several hundred acres of land, with about three miles water front. That it includes the whole west end of the island, and all the water front upon the whole island capable of being used for docks or landings, thus cutting off the rest of the island from access by water.

4th. The purport of all the opposing affidavits is, that the main object which the commissioners had in view in making the selection was *isolation*.

They have not, in fact, selected a site for a landing and boarding station, but have taken territory to *include* and *isolate* one. The site is yet to be selected out of the territory which they have designated.

5th. There is nothing in the opposing papers to negative the charge which we make as an inference from the above facts, that they have not made the selection *bona fide* for the purposes of a landing and boarding station, but for other purposes not authorized by the act; and if they had in view purposes not authorized by the

act, it is of no consequence that they may have thought those purposes meritorious and beneficial to the public.

V. It is clear, even upon the ground taken by themselves, that they have exceeded the powers given them by the legislature.

1st. They had no power conferred upon them but to select a suitable site upon the west end of Coney Island, for the actual uses and purposes of a landing and boarding station.

They had no right to take plaintiffs' property for the purpose of *isolating* such site or station.

2d. They have shown no necessity or good reason for isolating it.

They talk about *invasion* and *danger from communication* with the people.

*Swinburne* thinks it desirable to erect a *barrier across the island* on its eastern boundary.

It is said it would be very improper to have persons bathing near it.

Another object was to prevent people from starting from the island at night in boats to visit vessels at quarantine.

They had no right to take plaintiffs' land for any such purposes.

The *invasion* spoken of must mean for the purpose of destroying the buildings and property to be put there.

They had no power given them to take land for that purpose.

3d. It does not appear that it couldn't be *isolated* as well, if confined to five acres, as if it embraced five hundred·

4th. The action of the commissioners in this alleged selection of a site shows a reckless, wanton and high-handed disregard of the rights of the owners of the land.

The only object seems to have been to take as much land as might ever be wanted for any purpose.

They might as well have gone upon any other housetop and run a line due south, or due east, and have taken the whole island.

5th. The affidavits on the part of the defendants are of the most vague and unsatisfactory kind. When carefully examined, there is nothing in them upon which any court can form any satisfactory judgment.

It would be permitting a gross outrage upon private rights to allow a large and valuable tract of land to be taken upon these vague, unmeaning allegations about the necessity or desirableness of *isolation.*

VI. We, however, maintain that the ground of isolation set up in their affiadvits is merely a convenient subterfuge; that they have made the selection, not *bona fide* for the uses and purposes of a landing and boarding station, but for other purposes not authorized by law.

What their motives and purposes were, it is unnecessary for us to show. They have undertaken to "*secure a tract of land ten times more than sufficient for the whole quarrntine establishement, on a grand scale.*" They may not intend to use it for all quarantine purposes until further legislation, and they may or may not intend to obtain further legislation.

VII. It is claimed, no doubt, in this case, that the commissioners had a discretion, in making the selection, which cannot be interfered with. That is, no doubt, the rule, where the discretion is exercised according to law and in good faith, and with fairness; but illegality and unfairness have always been exceptions to the rule. (*Phillips* agt. *Wickham,* 1 Paige, 590 ; *The Oswego Falls Bridge Co.* agt. *Fish.* 1 *Barb Ch.* 547 ! *Walker* agt. *Deverevx,* 4 *Paige,* 230; *Agar* agt. *Regent's Canal Co.* 1 *Cooper's Cas. in Ch.* 77 ; *Webb* agt. *Manchester Railway, a Railway Case,* 575.)

VIII. The admitted facts in the case being such as to justify and sustain the inference that this ground was not *bona fide* selected only as a site for a landing and board-

ing station, but with a view to other purposes, if the answer and affidavits upon the other side are supposed to controvert that position, the injunction should be allowed and continued until that question is decided at the hearing.

It cannot be supposed that defendants' affidavits settle that question in favor of the defendants; and we should have an opportunity to try it.

It is a proper case for an issue, (*Agar* agt. *The Regent's Canal Co. Cooper's Cas. in Ch.* 67; *Webb The Manchester Railway*, 1 *Railway Cas.* 576; 4 *Myl. & Cr.* 116.)

IX. The act of 1851, in relation to state officers and state bonds of officers, does not apply to these commissioners.

The second section shows clearly that it only refers to those general state officers for whom it was the duty of the attorney general to appear, and that the law was made for his benefit.

So decided, *N. Y. and Harlem R. R.* agt. *The Mayor*, 1 *Hill*, 562.

However, we have also given notice for the general term.

H. W. JOHNSON, *for defendants.*

*By the court,* GILBERT, J. (No written opinion given.) Order of special term reversed, and ordered that an injunction issue pursuant to the prayer of the complaint.

———•◆•———

## NEW YORK COMMON PLEAS.

### ISAAC HERMAN agt. NEWMAN AARONSON.

An application, under section 199 of the Code, for the refunding of money deposited in lieu of bail, on the arrest of a defendant, cannot be made until bail has been put in and *justified.*

*Special Term, December,* 1867.

MOTION under the 199th section of the Code, to refund money deposited with the sheriff, instead of bail, at the time of the arrest of the defendant. The application was that the money be refunded, not to *defendant,* but to *J. Aaronson,* son, who, it is claimed, deposited it to secure the discharge of defendant from arrest. The motion was made *before the bail had justified.* There was some conflict in the affidavits, as to whether the money belonged to defendant or to J. Aaronson. The money was also claimed to have been attached as the defendant's property.